Filed 1/29/25  In re Gabriel M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re GABRIEL M., a Person Coming Under the Juvenile Court Law.

THE PEOPLE,

      Plaintiff and Respondent,

v.

GABRIEL M.,

      Defendant and Appellant.

E083978

(Super.Ct.No. RIJ2100530)

OPINION

APPEAL from the Superior Court of Riverside County.  Mark Petersen, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

Section 707 of the Welfare and Institutions Code "sets forth the procedures for transferring a minor from juvenile court to criminal court." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*); unlabeled statutory references are to the Welfare and Institutions Code.) The Legislature amended the provision in both 2023 and 2024. (*Ibid.*)

In May 2024, the juvenile court ordered Gabriel M. transferred from the juvenile court to criminal court under section 707. Gabriel appeals from that order. He argues that the trial court prejudicially erred by either (1) failing to apply section 707 as it was amended in 2024 by Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545) (Stats. 2023, ch. 716, § 1) or (2) incorrectly applying the new law and not considering the relevant factors that Senate Bill 545 required the court to consider. Gabriel also argues that his trial counsel rendered ineffective assistance by failing to advocate against transfer on the basis of the 2024 amendments. We reject Gabriel's claims of error and conclude that any deficient performance by trial counsel was harmless, and we therefore affirm.

LEGAL FRAMEWORK

Section 707 "provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.) "Upon receiving a transfer motion, the juvenile court is required to 'order the probation officer to submit a report on the behavioral patterns and social history of the minor.' (§ 707, subd. (a)(1).)" (*Kevin P. v. Superior Court* (2020) 57

2

Cal.App.5th 173, 186.) "The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*Miguel R.*, at p. 164.)

Subdivision (a)(3) of section 707 (§ 707(a)(3)) now provides: "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*" (§ 707(a)(3), italics added.) The italicized language was added by Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) and effective in January 2023. (Stats. 2022, ch. 330, § 1; *Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"The five statutory criteria listed in subparagraphs (A) through (E) of section 707(a)(3) were not amended by Assembly Bill 2361. Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)), (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction'

3

(§ 707[, subd.] (a)(3)(B)(i)), (3) '[t]he minor's previous delinquent history' (§ 707, subd. (a)(3)(C)(i)), (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (§ 707, subd. (a)(3)(D)(i)), and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (§ 707, subd.(a)(3)(E)(i)). The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.) These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682.)

Effective January 2024, Senate Bill 545 "amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.) "The previous version of the statute made consideration of those factors discretionary, not mandatory. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) With respect to the degree of criminal sophistication, Senate Bill 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a

victim of human trafficking, sexual abuse, or sexual battery.' (§ 707, subd. (a)(3)(A)(ii).)"[1] (*Miguel R.*, at pp. 164-165; Stats. 2023, ch. 716, § 1.)

BACKGROUND

I. *Delinquency history*

In September 2021, Gabriel was declared a ward of the court when he was 17 years old. He admitted committing felony grand theft in violation of Penal Code section 487, subdivision (c). According to the detention report, the offense occurred at Jurupa Valley High School, where Gabriel got in another student's face and said, "'You're my bitch, I'm going [t]o fuck you up,'" took the student's hat off of his head, yanked a chain off the student's neck, punched the student in the face, and ran away with the hat and the

---

[1] The listed relevant factors for the five criteria are: "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication" (§ 707, subd. (a)(3)(A)(ii) [the degree of criminal sophistication]); "the minor's potential to grow and mature" (*id.*, subd. (a)(3)(B)(ii) [possibility of rehabilitation within the time remaining of juvenile court jurisdiction]); "the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior" (*id.*, subd. (a)(3)(C)(ii) [previous delinquent history]); "the adequacy of the services previously provided to address the minor's needs" (*id.*, subd. (a)(3)(D)(ii) [previous juvenile court attempts to rehabilitate]); and "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (*id.*, subd. (a)(3)(E)(ii) [circumstances and gravity of the alleged offense]).

chain. The juvenile court released Gabriel to his father's custody and placed him on probation.

II.      *The alleged offenses*[2]

One night in June 2022, law enforcement was dispatched to investigate a shooting at a mobile home park. Ethan Anguiano had suffered a gunshot wound to his torso. Anguiano was transported to a hospital, where he died as a result of the injury.

In investigating what happened, law enforcement obtained surveillance footage and talked to three juveniles who were with Anguiano when he was shot. The surveillance footage showed three vehicles drive into the mobile home park and park near the rear entrance. Six individuals, including Gabriel, were in the vehicles, and law enforcement determined that all six were members of the criminal street gang Dodd Street or Mira Loma Dodd Street. Of the six, three were 18 to 21 years old (Manuel Plascencia, Joey Duenas, and Steven Martinez), and three were 17 years old (Gabriel, Joaquin B., and Julian C.). Gabriel was a passenger in a car driven by Duenas.

All four victims met with Plascencia at the rear pedestrian gate, shook hands with him, and then walked through the pedestrian gate. The victims believed that they were meeting with Plascencia to smoke marijuana and/or to repay a debt owed to one of the perpetrators. The victims heard a whistle when they walked out to meet Plascencia. Upon exiting the gate, the victims were immediately ambushed by Duenas, Martinez,

---

**2**      We take the facts concerning the offenses from the probation report and a supplemental incident report from law enforcement, which was generated to assist the probation department in drafting its section 707 report.

6

Gabriel, Julian, and Joaquin. Gabriel pointed a gun at the victims. Julian took backpacks containing Chromebooks from Anguiano and another victim. Martinez attacked another victim, and someone took a necklace from one of the victims. After the attack, the six perpetrators ran toward their vehicles while the victims remained standing by the gate, at which point the victims "suddenly began to take gun fire from [Gabriel], at which point [Anguiano] was shot."

In August 2022, Gabriel was arrested and interviewed by law enforcement. He admitted that he shot and killed Anguiano. He also admitted that he and the other perpetrators were members of Dodd Street. He said that the victims were members of the Fourth Street or Cuatro Flats gang, which the probation department described as a rival gang of Dodd Street. Gabriel said that he initially attempted to scare Anguiano by shooting one round away from him, but Anguiano did not seem afraid. Anguiano told Gabriel, "'See, you're a bitch.'" Gabriel "thought to himself, 'alright, then you can have it,'" and he fired at Anguiano multiple times from a distance of 12 to 15 feet, hitting him once.

One hour before the killing, Gabriel posted a video on Instagram in which he filmed himself saying "'We 4K Killas' and 'We Flats Killing,'" which law enforcement explained were references to Cuatro Flats. Martinez is visible in the background of the video. About 35 minutes before the killing, Gabriel posted a video of himself seated in a car with the other perpetrators and asking them "if they were 'packing.'" They answered, "'no,'" and Gabriel said, "'I am.'"

Immediately before the incident, Plascencia texted Duenas that the victims were on the way and that Plascencia would give the signal for the attack. Law enforcement determined that Plascencia planned the attack and that the perpetrators attacked the victims because of the victims' association with a rival gang.

III.    *The petition and the probation report*

In August 2022, the People filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)), which they amended in December 2022. The amended petition alleged that in June 2022, when Gabriel was 17 years old, Gabriel committed one count of first degree premeditated murder (Pen. Code, § 187, subd. (a)), one count of robbery (Pen. Code, § 211), and one count of active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)). The amended petition further alleged that Gabriel committed murder and robbery for the benefit of, at the direction of, and in association with a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1)(C).) As to the murder count, the amended petition also alleged that Gabriel personally and intentionally discharged a firearm, causing great bodily injury and death to another. (Pen. Code, §§ 12022.53, subd. (d), 1192.7, subd. (c)(8).)

Immediately after the initial petition was filed in August 2022, the People moved to transfer Gabriel to criminal court. In April 2023, the probation department submitted a report pursuant to subdivision (a)(1) of section 707 recommending transfer.

The report described Gabriel's personal history and included statements from Gabriel and both of his parents. Gabriel spoke with the probation officer with his lawyer

8

present and did not answer any questions about the offenses or his gang membership. Gabriel described himself as a leader, who his peers tend to follow. Gabriel's parents were divorced in 2008, and Gabriel had six siblings.

Gabriel denied that he was the "victim of any form of abuse." The family had a history with the child welfare system, with two of 11 referrals substantiated. One of the substantiated referrals involved a report of general neglect made against Gabriel's mother when Gabriel was four years old. The reporting party alleged that Gabriel's mother "'smacked' [Gabriel] over the head with papers, threw him on the floor, and kicked him in the chest."

In May 2022, a referral for general neglect by both parents was substantiated. Gabriel tested positive for cocaine after he was seriously injured when a car in which he was a passenger drove off a cliff. Gabriel sustained three broken ribs, a dislocated and bruised hip, and a fractured skull. In December 2021, Gabriel's father reported that Gabriel had a history of concussions from playing football. In March 2023, Gabriel reported that he had suffered from migraines for years, which were exacerbated by the injuries that he suffered in the car crash. Gabriel told the probation officer that the "near death experience caused him to rethink his life choices," and that he would now "mak[e] better choices."

Both of Gabriel's parents had criminal histories, and Gabriel's mother admitted that she had substance abuse issues. Gabriel's father served three years in prison in the mid-2000s for felony possession of a controlled substance. In 2018, Gabriel's mother

was sentenced to four years in prison for charges related to felony importation of a controlled substance. She was released from prison in August 2021 and on house arrest in 2023.

With respect to Gabriel's school history, the report documented that Gabriel was in 12th grade at Jurupa Valley High School when he was expelled in October 2021 as a result of the theft that led to his wardship. While attending that school, Gabriel received 95 negative behavior referrals for such things as fighting, disrupting class, arguing with teachers and students, and displaying gang signs. In October, Gabriel began attending Arlington Regional Learning Center, where he received "four disciplinary marks for walking out of class, disruption, having a vape pen, and profanity towards school staff."

In December 2021, Gabriel was placed on an individualized education program, which as later amended allowed him to have preferential seating away from distractions, additional time to complete assignments and to take tests, breaks from the classroom, and a trusted adult to speak with when in distress. The probation officer reported that Gabriel while in juvenile hall graduated from high school and began attending online college courses. Gabriel said that he was better able to focus in the independent learning environment, which he preferred. He previously had issues with school officials and classmates, reporting that he was "the target of bullying" from a young age, which "caused him to always be on the 'defensive'" and "to get involved in both physical and verbal altercations with peers and instructors."

10

The probation officer reported that Gabriel was otherwise doing well overall in juvenile hall, although Gabriel initially received numerous rule violations related to three-way phone calls with his girlfriend, which were initiated by his mother.

The report briefly summarized Gabriel's performance while a ward of the court, which included the commission of the underlying offenses in June 2022. In December 2021, Gabriel admitted probation violations involving drug testing, "school terms," and leaving home without permission. He was continued as a ward of the court, released to his father, and ordered to complete an inpatient drug treatment program. Gabriel attended the program but was discharged in January 2022, two days before completion, because he refused to attend school. Between January 2022 and his arrest in August 2022, Gabriel tested positive for marijuana 13 times and for cocaine twice—once in April following the car accident and once in July (following the underlying offenses). Gabriel told the probation officer that he last used cocaine in April 2022, on the night of the car accident.

Gabriel reported that marijuana was his drug of choice. He smoked it daily but did not believe that he was addicted. Gabriel stated that he used cocaine daily before he was on probation. Gabriel said that he was sober in detention.

The report described Gabriel's mental health history. In addition to attending the inpatient drug treatment program while a ward of the court, Gabriel also attended functional family therapy, which included weekly family and individual counseling and twice weekly substance abuse group counseling. Gabriel reported that he benefitted from

11

the services in that even though he continued to use marijuana, he "mostly abstained" from more serious drugs.

In January 2023, the probation department asked the court to order Gabriel to submit to a psychological evaluation, but the court sustained Gabriel's objection to the request. But a psychological evaluation had already been authorized by the court in December 2021, and the probation officer summarized the findings of that report. Dr. Nilda Diaz, PsyD, a licensed clinical psychologist, reported that Gabriel's "'psychiatric symptoms include anxiety, sleep disturbance, guilt, depression, and behavioral disturbance in the form of opposition to authority anger outbursts, verbal aggression, and history of physical aggression.'" Dr. Diaz opined that "'Gabriel has developed an extensive pattern of maladaptive coping with respect to his underlying anxiety, interpersonal distress, and feelings of guilt and shame,'" including "'a pattern of escaping from external and internal stressors,'" such as by using substances to self-medicate. She further opined that Gabriel had "'poor insight and awareness into his pattern of unsuccessful coping.'"

The probation officer recommended transfer to criminal court on the basis of four of the five statutory criteria contained in section 707(a)(3): the degree of criminal sophistication exhibited by the minor, the success of previous attempts by the juvenile court to rehabilitate the minor, the minor's delinquency history, and the circumstances and gravity of the offense.

12

As to the fifth criterion–whether the minor could be rehabilitated before expiration of the juvenile court's jurisdiction—the probation officer contended that it weighed in favor of finding that Gabriel was suitable for rehabilitation under the juvenile court's jurisdiction. The probation officer indicated that as of the writing of the report in March 2023 Gabriel was 18 years old and would have six and one-half years remaining under juvenile court jurisdiction. The probation officer noted that Gabriel's "escalation from Grand Theft on a Person to Murder, Robbery, and Participation in a Criminal Street Gang, lends doubt to his amenability to treatment." The probation officer further noted that Gabriel otherwise had not exactly taken his wardship seriously, but the officer nevertheless opined that "anything is possible over the six-and-a-half-year period should [Gabriel] commit himself to rehabilitation."

IV.    *The transfer hearing*

The juvenile court held the contested transfer hearing in April 2024. No witnesses testified. In a trial brief filed before the hearing, Gabriel's counsel argued that the People had not carried their burden under section 707 of demonstrating by clear and convincing evidence that Gabriel should be transferred to criminal court. Gabriel's counsel focused on the 2023 amendments to section 707 (as also reflected in changes made to California Rules of Court, rule 5.770), particularly the then-new requirement that the court find by clear and convincing evidence that Gabriel was not amenable to rehabilitation while under the juvenile court's jurisdiction. Counsel argued that Gabriel's amenability to rehabilitation was generally supported by his documented "history of childhood trauma,

13

involving neglect, physical and emotional abuse, learning disability, and substance abuse." Counsel summarized the portions of the probation report describing Gabriel's family and social history, including the family's history with the child welfare system and the fact that Gabriel had been bullied as a child, his mental health and substance abuse history, his academic history, and his behavior while in juvenile hall.

Counsel argued that each of the five statutory criteria under section 707(a)(3) supported the conclusion that Gabriel was amenable to rehabilitation while under the jurisdiction of the juvenile court. With respect to the evaluation of each factor, counsel asserted that the court "may give weight" to any relevant factor, including those listed in the statute before its amendment by Senate Bill 545. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

In evaluating the degree of criminal sophistication exhibited by Gabriel, counsel argued that the following factors in particular weighed in favor of keeping Gabriel under juvenile court jurisdiction: (1) Gabriel's brain was in the early stages of development when he committed the offenses at age 17; (2) Gabriel's "exposure to trauma, including bullying, violence, physical and emotional neglect, combined with substance abuse"; and (3) peer pressure and "[t]he influence of gang-involved peers."[3]

As to the possibility that Gabriel could be rehabilitated before the juvenile court's jurisdiction expired, counsel agreed with the probation officer that the time remaining until Gabriel's 25th birthday, along with the nearly two years that he had already spent in

---

[3] In this portion of the trial brief, counsel referred to a report written by "Dr. Kalich" and cited an exhibit that was not attached to the brief.

14

detention, was sufficient "to implement care, treatment, and training programs for his rehabilitation." Counsel believed that placement in a secure youth treatment facility would give "Gabriel the potential to grow and mature."

With respect to Gabriel's delinquency history, counsel argued that the grand theft and the probation violations for using controlled substances and leaving home without permission were not "particularly 'serious.'" Counsel also noted the probation report's acknowledgement that Gabriel's behavior resulted partly from his "continued association with negative peers" and "a lack of proper parental supervision," given that his mother was incarcerated, his father was often busy with work, and his father failed to discipline Gabriel or impose any consequences for his continued association with those peers.

Regarding the previous attempts to rehabilitate Gabriel, counsel argued that the services provided to Gabriel while on probation were limited and inadequate for the following reasons: "The attempts to rehabilitate Gabriel were limited to community based programs. He was never adequately held accountable for this conduct, and it appears that no on[e] appeared to follow up with the results of Dr. Diaz's psychological evaluation. Thus, he has never received adequate rehabilitative services in a structured setting to address his trauma, substance abuse disorder, or diminished cognitive abilities."

As it pertains to the circumstances and gravity of the offenses, counsel acknowledged the graveness of taking another's life. But counsel argued that Gabriel's "mental and emotional development should also be considered in the evaluation of this criterion," highlighting the "significant trauma" Gabriel experienced as a child, his severe

15

substance abuse disorder, and his lack of emotional and mental development when the offenses were committed. Counsel also noted that Gabriel's "lack of maturity played a role in his actions, particularly combined with [the] influence of peers . . . as the individual that planned the incident, and the individual that drove Gabriel to the scene were both older adults."

At the hearing, defense counsel reiterated many of the points that he made in the trial brief with respect to each of the five statutory criteria. Counsel repeatedly emphasized that the court should consider the effect of both Gabriel's familial trauma and the effect of peer pressure by the adults who planned the attack. Counsel newly noted that the fact that Gabriel stayed back after the other perpetrators left "show[ed] that [Gabriel] was responding to his trauma, his familial trauma." In addition, counsel newly argued that Gabriel's statement about why he shot the victim demonstrated that he acted with "impetuosity" and failed to appreciate the possible consequences of his actions. Counsel also reiterated that the court should consider the nearly two years that Gabriel had already spent in juvenile hall as part of "the time for treatment."

After hearing argument from the prosecution and Gabriel's counsel, the juvenile court took the matter under submission and set a hearing for May 15, 2024, to issue its ruling.

V. *The ruling*

Before the hearing in May 2024, the juvenile court issued a written statement of decision granting the transfer motion. In reaching its decision, the court considered the

16

probation report, the detention report, a supplemental incident report, and Dr. Diaz's

psychological evaluation report, along with the arguments of counsel.[4]  At the hearing,

the court summarized on the record the ruling contained in the statement of decision.  The

court's on-the-record ruling is memorialized in a minute order from that hearing.

The juvenile court found that Gabriel "is not amenable to rehabilitative efforts or

services" and "that the People have met their burden by clear and convincing evidence to

have this court order a transfer to a court of criminal jurisdiction."  The court explained

that in reaching its conclusion it "carefully examined" each of the five statutory criteria in

section 707(a)(3).  In outlining its findings, the court described the statutory requirement

for each criterion.

For the first criterion—the degree of criminal sophistication exhibited by the

minor (§ 707, subd. (a)(3)(A)(i))—the court described the statutory mandate for that

criterion as:  "[T]he court shall give weight to any relevant factor as stated in section

[707, subdivision] (a)(3)(A)(ii) of the Welfare and Institutions Code.  The list of relevant

factors is voluminous and indicates that the court may give weight to these factors as the

court deems appropriate."  The court summarized law enforcement's investigation of the

offenses and noted that Gabriel was already a ward of the court when the offenses were

committed.  The court concluded that the criterion supported transferring Gabriel to

criminal court, finding that (1) "the evidence does support a finding that the minor knew

---

[4]     The supplemental incident report was prepared by law enforcement in August
2022 for the probation department to use in drafting its section 707 report. The
supplemental incident report contained a summary of law enforcement's postarrest
interview of Gabriel.

what he was doing, participated willingly, had knowledge of weapons and firearms," (2) "[d]espite being a ward of the court for prior delinquent behavior, [Gabriel] chose to engage in a very risky and dangerous event involving the use of a firearm," and (3) Gabriel "discharged his firearm in an aggressive act toward the victim" with no indication that he was acting in self-defense.

With respect to the second criterion—whether Gabriel could be rehabilitated prior to the expiration of the juvenile court's jurisdiction (§ 707, subd. (a)(3)(B)(i))—the court noted that the statute provided that the "court shall give weight to the minor's potential to grow and mature." The court disagreed with the probation department's view that the criterion supported denial of the transfer motion. The court concluded that there was not sufficient time to provide Gabriel "with successful rehabilitative services such that [Gabriel] would benefit and become law abiding," reasoning that there were too "many areas of [Gabriel's] behavior and lifestyle that need services and rehabilitative efforts, coupled with [Gabriel's] poor performance on probation, and escalating seriousness in criminal activity."

Regarding the third criterion—previous delinquent history (§ 707, subd. (a)(3)(C)(i))—the court explained that section 707 provided that "the court shall give weight to any relevant factor, including the seriousness of the minor's previous delinquent history." The court reasoned that transfer to criminal court was appropriate under this factor given Gabriel's poor performance as a ward of the court and

"unwillingness to comply with court orders, as evidenced by his violations of probation and his involvement in newer delinquent activity."

With respect to the fourth criterion—the success of previous attempts by the juvenile court to rehabilitate the minor (§ 707, subd. (a)(3)(D)(i))—the court concluded that the criterion favored transferring Gabriel to criminal court. The court reasoned that despite having previously been offered rehabilitative services, including placement in an inpatient drug treatment program, Gabriel performed poorly in school and continued testing positive for drugs, demonstrating that the program did not have an impact on Gabriel's decisionmaking.

As to the fifth criterion—the circumstances and gravity of the offense (§ 707, subd. (a)(3)(E)(i))—the court concluded that it favored transfer to criminal court given that the egregiousness of the offense and that Gabriel acted deliberately, intentionally, and with calculation.

After the juvenile court summarized its ruling on the record, defense counsel did not object to the ruling.

## DISCUSSION

I. *Standard of review*

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for

substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Ibid.*) "The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence." (*Ibid.*)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (§ 707(a)(3).) Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

Interpretation of a statute presents a question of law, which we independently review. (*People v. Reynoza* (2024) 15 Cal.5th 982, 989.) Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to give effect to the law's purpose. (*Ibid.*) """"We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.""""" (*Ibid.*)

II.     *Application of the current version of section 707*

Gabriel argues that the juvenile court abused its discretion by "err[ing] as a matter of law, in May 2024, by demonstrably failing to consider section 707 factors that were made mandatory pursuant to SB 545's January 1, 2024 amendments to the statute.  Any presumption that the trial court applied the most up to date version of the statute, or applied the existing version of the statute correctly, is overcome by the record."  We disagree.

The People contend that Gabriel forfeited the challenges by failing to raise them below.  Because Gabriel also contends that his trial counsel provided prejudicially ineffective counsel by failing to object to the juvenile court's alleged error, we exercise our discretion to review the arguments on the merits.  (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

The record demonstrates that the juvenile court correctly applied section 707 as it was amended in 2024 by Senate Bill 545.  In the statement of decision, the juvenile court recited the newly added statutory requirements that the court "shall give weight to any relevant factor as stated in section [707, subdivision] (a)(3)(A)(ii)," "shall give weight to the minor's potential to grow and mature," and "shall give weight to any relevant factor, including the seriousness of the minor's previous delinquent history."  The "shall give weight" language is taken verbatim from section 707 as it was amended by Senate Bill 545.  (Stats. 2023, ch. 716, § 1; § 707, subd. (a)(3)(A)(ii), (B)(ii), & (C)(ii).)  The juvenile court's use of that language shows that the court was applying section 707 as it

21

was amended by Senate Bill 545. The court explicitly understood section 707's new requirement that the court "'give weight to any relevant factor,' including the specific factors listed as relevant to each criterion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164; § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) The prior version of the statute provided that the court "may give weight" to any relevant factor (former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii)), so "consideration of those factors [was] discretionary, not mandatory" (*Miguel R.*, at pp. 164-165). Given that the juvenile court expressly recognized that its consideration of the relevant factors was mandatory and not discretionary, the juvenile court's ruling demonstrates that it was applying section 707 as it was amended by Senate Bill 545.

To support his argument that the juvenile court did not apply section 707 as it was amended by Senate Bill 545, Gabriel focuses on the portion of the court's written statement of decision pertaining to the degree of criminal sophistication exhibited by the minor. Gabriel argues that the court's statement that "[t]he list of relevant factors is voluminous and indicates that the court *may* give weight to these factors as the court deems appropriate" (italics added) "belies any contention that the juvenile court was aware that it now *must* give weight to several factors." (Bold omitted.) The argument lacks merit.

Subdivision (a)(3)(A) of section 707 (§ 707(a)(3)(A)) provides that in evaluating the degree of criminal sophistication exhibited by the minor "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity,

intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." The statute thus requires the court to consider the listed factors (along with any other relevant factors), but the statute does not direct the court to assign any particular weight to any particular factor. The juvenile court's ruling is consistent with the requirement. The court acknowledged that it was required to consider "any relevant factor as stated in section [707, subdivision] (a)(3)(A)(ii)" but that in doing so it "*may* give weight to these factors as the court deems appropriate." (Italics added.) The court correctly understood that it retained the discretion to determine how much weight to afford the relevant factors that it was required to consider. The juvenile court's statement that it "may give weight to these factors as the court deems appropriate" accordingly does not conflict with section 707(a)(3)(A) as it was amended by Senate Bill 545.

Gabriel also argues that the juvenile court's failure to mention certain factors that the court was required to consider "undermines any contention that the juvenile court did actually meaningfully weigh these factors, as required." In particular, he contends that the juvenile court failed to mention (1) the effect of Gabriel's family and community

23

environment, including both parents' histories of criminality and substance abuse and Gabriel's childhood trauma, including his history of head trauma, as they relate to both the degree of criminal sophistication (§ 707, subd. (a)(3)(A)(ii)) and Gabriel's previous delinquency history (*id.*, subd. (a)(3)(C)(ii)), (2) Gabriel's involvement in the child welfare system as it relates to the degree of criminal sophistication (*id.*, subd. (a)(3)(A)(ii)), (3) the adequacy of services previously provided to address Gabriel's needs with respect to the success of previous attempts to rehabilitate Gabriel (*id.*, subd. (a)(3)(D)(ii), and (4) the postarrest progress that Gabriel had made while in juvenile hall. The argument lacks merit.

Nothing in section 707(a)(3) requires that the juvenile court's ruling include express analysis of all of the factors that the court is required to consider for each of the five statutory criteria. (*Id.*, subd. (a)(3)(A)-(E).) Section 707 requires only that when ordering a juvenile transferred to criminal court, the juvenile court "shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707(a)(3).) Section 707 thus requires the juvenile court to state its reasoning with regard to the ultimate question of the minor's amenability to rehabilitation. The juvenile court complied with that requirement—it explained the basis for its decision in an order entered upon the minutes, which included "the reasons *supporting* the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707(a)(3), italics

24

added.)  The juvenile court evaluated each of the five statutory criteria and identified the facts that persuaded the court that Gabriel was not amenable to rehabilitation.  (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1294.)  Insofar as the juvenile court did not mention any particular factors (statutorily listed or otherwise), the juvenile court implicitly found that those factors did not support the court's determination that Gabriel was not amenable to the jurisdiction of the juvenile court.

For the foregoing reasons, we conclude that Gabriel has not shown that the juvenile court failed to apply section 707 as it was amended by Senate Bill 545, or applied it incorrectly.  Gabriel has therefore failed to carry his burden on appeal of showing that the juvenile court erred.

III.    *Ineffective assistance of counsel*

Gabriel also argues that his trial counsel rendered ineffective assistance by failing "to ensure the juvenile court was cognizant of the relevant, favorable amendments" and by failing to object to the trial court's failure to give meaningful weight to the mandatory statutory factors.  In a separately filed petition for writ of habeas corpus (*In re G.M.*, E085083), Gabriel argues that his trial counsel was unaware that section 707 was amended in 2024 and that counsel consequently failed to brief the new factors or to argue about their significance "and/or object[] to the trial court's evident application of the former framework."  In an attached declaration, trial counsel attests that he was not aware that section 707 had been amended in 2024 and thus was not aware of the new statutory

25

requirements, so he did not brief or argue about them. We conclude that any deficient performance by counsel was harmless.

"To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 (*Sepulveda*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

We assume for the sake of argument that the representation of Gabriel by his trial counsel fell below an objective standard of reasonableness, because trial counsel did not know that section 707 was amended in 2024 and thus did not advocate on Gabriel's behalf based on the applicable law governing transferring a minor from juvenile court to criminal court. (See *Hinton v. Alabama* (2014) 571 U.S. 263, 274 ["An attorney's ignorance of a point of law that is fundamental to his [or her] case combined with his [or her] failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*"].) But Gabriel cannot demonstrate that "there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to" him. (*Sepulveda*, *supra*, 47 Cal.App.5th at p. 301.)

Counsel's failure to direct the juvenile court to the correct version of section 707 did not prejudice Gabriel, because the court expressly applied the correct version of section 707 anyway. And counsel's ignorance of the amendments to section 707 did not

26

impair counsel's ability to argue against transfer, because counsel argued against transfer on the basis of the same factors that the court is required to (and did) consider under the current version of section 707. Gabriel's counsel repeatedly urged the court to find him amenable to rehabilitation under the juvenile court's jurisdiction because of Gabriel's age, his mental and emotional health when the offenses were committed, his impetuosity and failure to appreciate the consequences of his criminal behavior, the effect that peer pressure had on his actions (especially by the adult perpetrators who planned the attack), the familial trauma that Gabriel experienced (including physical and emotional abuse), the effect of that trauma on Gabriel's delinquent behavior, Gabriel's potential to grow and mature, and the inadequacy of the services that Gabriel had previously received. Although Gabriel's attorney did not argue that the court was required by statute to consider the factors, he did argue that the court should consider all of them. And the court's ruling shows that the court was aware that it was required to consider them.

The only relevant factor added by Senate Bill 545 (putting aside factors rendered irrelevant by Gabriel's unequivocal denial that he was ever abused) is Gabriel's involvement in the child welfare system. (Stats. 2023, ch. 716, § 1; § 707, subd. (a)(3)(A)(ii).) But Gabriel's counsel's trial brief addressed Gabriel's significant child welfare history, and it was described in the probation report as well. Thus, in this way as well, Gabriel's attorney's ignorance of Senate Bill 545's amendments to section 707 did not impair his ability to argue against transfer. Counsel still argued all of the relevant factors, and the court was aware that it was required to consider them.

27

For all of these reasons, we conclude that it is not reasonably probable that the juvenile court would have reached a result more favorable to Gabriel if Gabriel's counsel had advocated for Gabriel based on the current version of section 707.[5]

DISPOSITION

The order transferring Gabriel to criminal court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

---

[5] For the reasons expressed in this opinion, by separate order we summarily deny Gabriel's petition for writ of habeas corpus.